# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| GUARDIAN FLIGHT, LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO._____ |
| | § | |
| AETNA HEALTH, INC., and | § | |
| MEDICAL EVALUATORS OF | § | |
| TEXAS ASO, LLC, | § | |
| | § | |
| Defendants. | | |

## ORIGINAL COMPLAINT

Plaintiff Guardian Flight, LLC ("Guardian") files this Original Complaint against Defendants Aetna Health, Inc. ("Aetna") and Medical Evaluators of Texas ASO, LLC ("MET") and would respectfully show the Court as follows:

## INTRODUCTION

1.     Guardian files this case to vacate an Independent Dispute Resolution ("IDR") arbitration award made by federal contractor MET pursuant to the No Surprises Act ("NSA"), which selected Aetna's purported Qualifying Payment Amount ("QPA") as the appropriate out-of-network payment for a 225-mile air ambulance transport.  The award was secured

through undue means and misrepresentations by Aetna and the application of a standard that violates federal law by a reviewer at MET.

2.     The NSA took effect on January 1, 2022.  It is implemented and enforced by the combined efforts of the U.S. Departments of Labor, Health and Human Services, and the Treasury (the "Departments"), which together issued interim and then final rules to create an unprecedented, mandatory federal arbitration process to determine pricing for all out-of-network ("OON") emergency air ambulance transports of patients who are covered by commercial insurance.  As part of that federal arbitration process, the Departments created a list of only eleven approved IDR entities (one of which is no longer accepting new disputes).[1]  There is virtually no information available to the parties to evaluate the competency or quality of the various entities.  If the parties to the proceeding do not agree on which IDR entity to use, the Departments appoint one for them.  Under the NSA, the IDR entity's decision is binding on the parties unless there has been a misrepresentation of fact to the IDR entity or it meets the requirements to be vacated under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a).

3.     On February 18, 2022, Guardian provided critical emergency air transport to a patient suffering hypoxia and an infected hip replacement,

---

[1] https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list

transporting her on a fixed-wing aircraft specially configured for medical transport, and providing continuous medical care by a crew of specially trained medical professionals throughout the 225-mile trip.  The emergent nature and medical necessity of the transport were never at issue – only the price to be paid for the transport.

4.     The patient was insured through Aetna, an insurer with which Guardian is OON.  Aetna allowed $31,965.53 on the claim, which it claimed to be its QPA.  A QPA is supposed to represent the *median* rate for contracted in-network services.  The purported QPA does not reflect market realities and, upon information and belief, does not comply with the statutory requirements of the NSA.

5.     The improperly-calculated QPA is only one part of the bad faith scheme Aetna contrived to minimize payment on the OON claim.  Aetna also concealed from Guardian in the IDR process information it was required under federal law to disclose as well as additional information requested by Guardian on how the purported QPA for the trip was calculated.

6.     Guardian and Aetna agreed on MET as the selected IDR arbitrator.  Aetna submitted what it claimed to be its QPA to MET, which was a misrepresentation of fact because the QPA had not been calculated in accordance with federal requirements.  An anonymous person at MET reviewed the parties' submissions and applied an illegal presumption in favor

of the QPA, thereby violating the NSA and rewarding Aetna for its bad faith scheme.

7.     Guardian hereby seeks to vacate the award and requests the Court to enter an order directing a rehearing with due process protections.

## **PARTIES**

8.     Plaintiff Guardian is a Delaware Limited Liability Company that provides air ambulance services in states around the country, including Nebraska and Texas.

9.     Defendant Aetna Health, Inc. is a Connecticut corporation that provides insurance and benefit administration services in states around the country. including Nebraska and Texas.

10.    Defendant MET is a Texas limited liability company that is headquartered in Houston, Texas.

## **VENUE AND JURISDICTION**

11.    The NSA creates a right to judicial review of awards issued in IDR proceedings.  *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).  Venue is proper under 28 U.S.C. § 1391(b) because both defendants reside in Texas.  It is also the district in which the award was made.  9 U.S.C. § 10(a).

12.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331, the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, because this matter

requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances at issue herein.

## FACTUAL BACKGROUND

13.     The air ambulance industry plays an integral role in the American healthcare system.  Air ambulances often serve as the only lifeline connecting critically ill and injured patients to healthcare, particularly in rural areas. They transport trauma, stroke, heart attack, and burn patients and other emergent cases requiring critical care.  Without air ambulances, more than 85 million Americans would not be able to reach a Level 1 or 2 trauma center within an hour when emergency care is needed.

14.     The delivery of on-demand, life-saving air ambulance services in emergencies requires substantial investments in specialized aircraft, air bases, technology,  personnel, and regulatory compliance systems.  In this particular case, Guardian's investment in fixed-wing air ambulances proved vital to rendering timely medical care.  On February 18, 2022, a patient who had post hip-replacement complications suffered hypoxia and potential cardiac complications.

15.     At the time, the patient was located in Alliance, Nebraska a sparsely populated part of Nebraska.  Because adequate medical facilities were

not available locally, emergency transport was requested to move the patient to a hospital in Kearney, Nebraska.

16.     The patient in question had begun suffering shortness of breath, chest pain, and hypoxia.  Guardian answered the call, transporting the patient on a medically equipped fixed wing aircraft and administering continuous medical care throughout the 225-mile trip.

**The No Surprises Act and Federal Independent Dispute Resolution Proceedings.**

17.     The NSA became effective January 1, 2022.  There are sections of the NSA that are unique to air ambulance transports because air ambulance transports are covered by the Airline Deregulation Act and are not subject to state rate regulation.  Broadly speaking, the NSA requires patient cost-sharing for emergency OON claims to be the same as for in-network claims.  That said, insurers are allowed to initially pay to the OON provider whatever amount they deem appropriate (or nothing at all).  If they make an OON payment that is too low, a provider must first attempt to negotiate a higher one.   If negotiations fail, a provider must submit the dispute to the IDR process.  During this process, the IDR entity (a federal contractor), without a hearing, must select one of the two offers submitted based on the position statements submitted by the parties.

18.     The Departments created a list of only eleven approved IDR arbitration entities (one of which is no longer accepting new disputes).  MET is a medical appeals company headquartered in Houston, Texas.  In 2022, it began accepting IDR disputes between payors and providers under the NSA.

19.     The award is made without a hearing or exchange of written submissions between the parties.  Accordingly, neither party is allowed the opportunity to respond to the other's submission.  The way the Departments have implemented the No Surprises Act results in a black -box approach where an individual at an IDR entity can make decisions without rhyme or reason. Judicial review of IDR proceedings is therefore essential to ensure that providers like Guardian receive due process and are not subject to bad faith schemes and unlawful decision making.

20.     Guardian and its affiliates have prevailed in a substantial majority of the disputes decided through the IDR process, including many favorable decisions by MET.  Many of the reasoned awards, including awards from MET, explain how the credible evidence submitted supports the OON payment requested.  However, it appears that an errant representative of MET is not following the law and applying an illegal standard.

21.     The NSA requires arbitrators to consider certain categories of information in determining the appropriate OON rate. *See* 42 U.S.C. § 300gg-

112(b)(5)(C) (Considerations in determination).[2]  The QPA is only one such piece of information.  *Id.* at § 300gg-112(b)(5)(C)(i).  The QPA is defined in the NSA as the "median of the contracted rates recognized by the plan or issuer" "for the same or a similar item or service" offered in the same insurance market and in the same geographic region as of January 31, 2019, increased by the consumer price index.  *Id.* at § 300gg-111(a)(3)(E)(i).  By regulation, a health plan can calculate its QPA using only rates it has "contractually agreed to pay a . . . provider of air ambulance services for covered items or services," expressly excluding any "single case agreement, letter of agreement, or other similar arrangement  .  .  .  for a specific participant or beneficiary in unique circumstances" as "not constitu[ting] a contract."  45 C.F.R 149.140(a)(1).[3]  If a plan or issuer does not have at least three in-network contracts for a service, the QPA may be determined based on information from a third-party database.  *Id.* § 149.140(c)(3)(i).

22.   The NSA enumerates additional information that must be considered:

---

[2] The No Surprises Act amended the Internal Revenue Code, the Employee Retirement Income Security Act (ERISA), and the Public Health Service Act (PHS Act).  All three statutory amendments are substantively identical.  Accordingly, for sake of brevity, citations to NSA requirements are to the PHS Act, 42 U.S.C. 300gg et seq.).
[3]  The regulations regarding how the QPA may be calculated are currently being disputed by the air ambulance industry.  *See, e.g., Assoc. of Air Medical Servs. v. U.S. Dept. of Health and Human Servs. et al.*, Case No. 1:21-cv-3031 in the United States District Court for the District of Columbia (filed 11/16/21).

- the quality and outcomes measurements of the provider that furnished the services;

- the acuity of the individual receiving the services or the complexity of furnishing such services to such individual;

- the training, experience, and quality of the medical personnel that furnished the services;

- ambulance vehicle type, including the clinical capability level of such vehicle;

- population density of the pick-up location (such as urban, suburban, rural, or frontier); and

- demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4 plan years.

42 U.S.C. § 300gg-112(b)(5)(C)(ii).  Furthermore, the IDR entity must consider any further information related to an offer and submitted by a party.  *Id.* at § 300gg-112(b)(5)(B)(ii).

**The Illegal Presumption in Favor of the QPA.**

23.    The Departments originally jointly published an Interim Rule that compelled IDR entities to apply a rebuttable presumption that the QPA was the appropriate OON rate.  Arbitrators were required to select the offer closest to the QPA unless a provider overcame the presumption with credible evidence.  This "thumb on the scale" approach was held illegal in litigation filed by the Texas Medical Association ("TMA") on behalf of physicians and facilities.  *See*

*Tex. Med. Ass'n v. United States Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879 at *15 (E.D. Tex. Feb. 23, 2022). Subsequently, in a related lawsuit, the same federal court invalidated the Departments' illegal presumption as it applied to air ambulance transports. *See Lifenet Inc. v. U.S. Dept. of Health & Human Servs., et al.,* No. 6:22-cv-00162-JDK, 2022 WL 2959715 at *10 (E.D. Tex., June 26, 2022)(vacating the requirement that additional information submitted by parties "demonstrate that the qualifying payment amount is materially different from the appropriate out-of-network rate").

24.     The claim at issue herein was decided on October 12, 2022, more than three months after the illegal presumption in favor of the QPA was invalidated. Accordingly, IDR entities like MET were required to consider all of the facts and circumstances of the payment dispute and select the offer that best represented the value of the air ambulance services provided to Aetna's member. The QPA was merely one data point, and should have had little relevance to this analysis, especially if Aetna failed to provide any evidence to show how its QPA was calculated or how it specifically related to the transport at issue.[4]

---

[4] For example, an insurer can calculate a QPA for use in Nebraska based on contracts it has for air ambulance providers in Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota and South Dakota (the West North Central Census Division). Accordingly, the QPA for a Nebraska transport could be based on in-network contracts with small, regional air

25.     The Final Rule, issued after the IDR decision at issue herein was made, did not adopt the QPA presumption from the Interim Rule.  The Final Rule states that "IDR entities should select the offer that best represents the value of the item or service under dispute after considering the QPA and all permissible information submitted by the parties." 87 Fed. Reg. 52,618 (August 26, 2022) at 52,628.

**Aetna Conceals How It Calculated Its Alleged QPA.**

26.     Guardian initiated the required 30-day Open Negotiation Period ("ONP") on June 6, 2022.  In its ONP notice, Guardian not only asked Aetna to disclose its QPA, but further requested the information required to be disclosed about how the QPA was calculated.  By regulation, Aetna should have disclosed to Guardian the following:

- information about whether the QPA includes contracted rates that were not set on a fee-for-service basis for the specific items and services at issue;

- whether the QPA for items and services was determined using underlying fee schedule rates or a derived amount;

- whether a related service code was used to determine the QPA for a new service code and, if so, information to identify which related service code was used;

---

ambulance providers that have no operations in Nebraska and could not possibly have performed the transport in question.  Such a QPA has little bearing on the appropriate OON rate for a transport in Nebraska with a large air ambulance provider like Guardian, which has significantly invested in bases across Nebraska so that life-saving transports in the state can actually occur.

- whether an eligible database was used to determine the QPA and, if so, information to identify which database was used to determine the QPA; and

- whether the plan's or issuer's contracted rates include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments for the items and services involved that were excluded for purposes of calculating the QPA.

*See* 45 C.F.R. § 149.140(d)(2).  As the Departments explain, disclosing this type of information "better inform[s] the open negotiation and IDR process."

27.   In response to Guardian request, Aetna provided no response. Aetna did not provide Guardian all of the information requested or required. Aetna instead decided to keep what it actually had done to create the improbably low QPA strictly under wraps.

**Aetna Submits a Purported QPA to MET, Where a Reviewer Applied the Illegal Presumption In Aetna's Favor.**

28.   Aetna claimed the QPA for the transport at issue was $12,755.87 for the base rate, $19,134.00 for mileage, and $75.66 for wait time, a total of $31,965.53.

29.   Certain payors are not properly calculating the QPA in accordance with the regulations, a fact the Departments have acknowledged.   For instance, the Departments concede that payors are not properly calculating QPAs for providers in the "same or similar specialty."   DEPTS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021*, Implementation Part 55 at pp. 16-17 (Aug. 19, 2022) available at

https://perma.cc/B7L7-QEKM.   They also concede that payors sometimes calculate the QPA by including contracts that have $0 listed for a service, thereby artificially depressing the QPA.   The Departments have stated that this practice is improper.   *Id.* at 17 n.29.

30.    Guardian and its affiliates were OON with Aetna and certain other commercial payors in 2019.   However, it was reimbursed by them for many transports during that year.   The historical OON rate from these commercial payors  (base and mileage) for a trip in Nebraska of this length and type was much higher than Aetna's purported QPA.

31.    Guardian has contracted rates for air ambulance services in Nebraska.   Its contracted rates are much higher than the purported QPA. Aetna did not disclose the in-network rates upon which its QPA is purportedly based.

32.    Compared to Aetna's historical average OON rate, and Guardian's own in-network rates, Guardian's alleged QPA—$31,965.53—is ***improbably*** low.   Upon information and belief, Aetna's QPA does not comply with the statutory requirements of the NSA.   Upon information and belief, Aetna therefore submitted in bad faith to MET a QPA that did not comply with federal law and thereby made a misrepresentation of fact to MET that it had been provided the QPA for the claim.

**A MET Reviewer Applies the Illegal Presumption In Aetna's Favor and Refuses to Consider Independent Market Data.**

33.     Below is the sum total of the reasoning provided by the MET reviewer in selecting the QPA as the appropriate payment for the flight at issue:

> According to 29 Code of Federal Regulations 2590.717-2 (b)(2), the arbitrator's decision is based upon a thorough and careful consideration of the evidence submitted by both parties, "provided the information is credible, relates to the circumstances described in paragraphs (b)(2)(i) through (vi) of this section, with respect to a qualified IDR service of a nonparticipating provider of air ambulance services or health insurance issuer of group or individual health insurance coverage that is the subject of a payment determination." Further, "Federal IDR Process Guidance for Certified IDR Entities" prohibits consideration of the factors enumerated in 29 Code of Federal Regulations 2590.716-8(c)(4)(iii)(v), and these factors have not been considered.
>
> . . .
>
> Guardian's submission has been considered carefully.   However, ***Guardian has not "clearly demonstrated that the qualifying payment amount is materially different from the appropriate out-of-network rate.***"   29 Code of Federal Regulations 2590.716-8(c)(4)(iii)(C).

The regulation cited and applied by the MET reviewer is the exact language that was held illegal and invalidated months prior to this claim being adjudicated.  As the Court in *Lifenet* explained:

> Accordingly, [ . . . ] the Court holds that the Rule conflicts with the Act and must be set aside under the APA. The Act unambiguously provides that arbitrators in an air ambulance IDR "shall consider" the QPA and several additional "circumstances."  Nothing in the Act instructs arbitrators to weigh any one factor or circumstance more heavily than the others. ***Yet, the Rule requires arbitrators***

> to "**select the offer closest to the [QPA]**" unless "credible" information, including information supporting the "**additional factors**," "**clearly demonstrate[s] that the [QPA] is materially different from the appropriate out-of-network rate.**" The Rule thus "places its thumb on the scale for the QPA, requiring arbitrators to presume the correctness of the QPA and then imposing a heightened burden on the remaining statutory factors to overcome that presumption."
>
> Because the Rule "rewrites clear statutory terms," ***it must be "h[e]ld unlawful and set aside"*** for this reason alone.

*See Lifenet Inc. v. U.S. Dept. of Health & Human Servs., et al.,* No. 6:22-cv-00162-JDK, 2022 WL 2959715 at *10 (E.D. Tex., June 26, 2022)(emphasis added)(internal citations omitted).  This illegal standard is not being applied by the vast majority of MET reviewers.  However, the reviewer on this claim illegally placed a "thumb on the scale for the QPA."

The MET reviewer further refused to consider the market data submitted by Guardian in support of its offer.  Instead, the reviewer claimed it was "prohibited" from taking market data into account in deciding the dispute.  This is not true.  Providers like Guardian are allowed to "submit to the certified IDR entity with respect to such determination ***any information relating to such offer***" that it wants the IDR entity to consider so long as it does not concern a prohibited factor (such as Medicare rates).  *See* 42 U.S.C. § 300gg-112(b)(5)(B)(ii).  And in the Final Rule, the Departments emphasized the importance of quantifiable evidence such as market data.  *See* 87 Fed. Reg.

52627 (2022).  Accordingly, the MET reviewer should have considered and not improperly rejected the market data submitted.

### AETNA'S AWARD SHOULD BE VACATED AND THE DISPUTE RESUBMITTED TO A NEW MET REVIEWER FOR A NEW IDR DETERMINATION

34.     The NSA allows a district court to vacate an arbitration award in the following four circumstances:

>   (1)     where the award was procured by corruption, fraud, or undue means;
>
>   (2)     where there was evident partiality or corruption in the arbitrators, or either of them;
>
>   (3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
>   (4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting the standards found at 9 U.S.C. § 10(a)(1)).  In addition, an IDR decision is not binding on a party where there is evidence of misrepresentation of facts presented to an IDR entity regarding the claim, such as an improperly calculated QPA.  *Id.*  The IDR award in favor of Aetna should be vacated under all five of these grounds.

35.     Aetna secured the award through undue means and misrepresentations of fact to MET.  It misrepresented the facts by submitting a purported QPA that was not properly calculated under federal law.  It further

refused to provide the information needed on its QPA for Guardian to explain why it was improperly calculated and was not an appropriate rate for the transport at issue.

36.    Also, the particular reviewer at MET handling this file revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers by using an illegal presumption in favor of the undisclosed QPA.  The reviewer refused to consider the market data evidence submitted by Guardian, a fact that alone warrants vacatur.  The reviewer also applied the illegal standard, stating that Guardian's evidence did not "clearly demonstrate[] that the qualifying payment amount is materially different from the appropriate out-of-network rate."

37.    The FAA permits this Court not only to vacate an award but to "direct a rehearing by the arbitrators" so long as the parties' agreement does not preclude it.  9 U.S.C. § 10(b).  Here, there is no agreement between the parties and thus nothing precluding a rehearing.  Furthermore, nothing in the NSA prevents a court from providing appropriate relief such as a rehearing when it vacates an IDR award.  Merely vacating the IDR award without directing a rehearing in accordance with the proper standards under the NSA would provide Guardian no relief at all, as only a rehearing can result in a higher payment under the new federal regulatory scheme created by the NSA.

38.     This case raises substantial issues of federal law relating to how the QPA may be permissibly calculated under the NSA and its implementing regulations, the proper interpretation of the NSA with respect to what constitutes a misrepresentation of fact to an IDR entity, the proper interpretation of the NSA with respect to whether IDR awards are enforceable where such misrepresentations of fact have occurred, and the proper remedy under the NSA and its implementing regulations where a payor has withheld material information from a provider.   It also concerns the due process requirements for review of decisions made by IDR entities, including the relationship between the NSA, which created a compelled process administered by a governmental agency, and the FAA, which governs voluntary agreements made between private parties

39.     In particular, IDR proceedings are unlike private arbitrations. Guardian did not voluntarily agree to arbitrate its payment dispute.   It is required by federal law to participate in IDR proceedings in order to try to obtain fair compensation for its services.   Unlike the traditional "rank and strike" procedure used by arbitration services such as the American Arbitration Association, Guardian did not select and had no input in selecting the individual at MET who actually decided the dispute, who remains anonymous to this day.   And unlike private arbitrations, Guardian was not provided any discovery and did not receive a reasoned award.   Indeed, the

award makes no mention of the specific, credible evidence submitted by Guardian in support of a higher payment.

40.     Due process requires more.   Guardian provided a life-saving transport and is entitled to a fair adjudication of the amount of its payment.

## REQUEST FOR RELIEF

41.     Guardian requests that the Court vacate the arbitration award at issue and declare that: 1) Aetna made a misrepresentation of fact to MET when it submitted what it represented was its QPA for the claim; 2) Aetna procured the IDR award at issue through misrepresentations and undue means; and 3) by applying an illegal presumption in favors of the QPA, the reviewer at MET revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42.     Guardian further requests that the Court direct MET to assign a different reviewer to rehear this claim, that the new reviewer be informed not to apply the illegal presumption in favor of the QPA, that MET implement a new briefing schedule so that Guardian can submit a new position statement and new offer, and to assure that Guardian receives due process by rendering a reasoned decision in accordance with the requirements of the NSA, upon consideration of all evidence submitted by the parties that relates to an offer, and without a presumption in favor of the QPA.

43.    Guardian further requests its attorney's fees and costs, and any other just and proper relief.

Dated:  November 1, 2022

NORTON ROSE FULBRIGHT US LLP

*/s/ Adam T. Schramek*
Adam T. Schramek, Lead Counsel
Texas Bar No. 24033045
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255
Telephone: (512) 474-5201
Facsimile:  (512) 536-4598
adam.schramek@nortonrosefulbright.com

Abraham Chang
Texas Bar No. 24102827
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246
abraham.chang@nortonrosefulbright.com

*Attorneys for Guardian Flight LLC*